## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**CHARLES O. PUGH,**
        **Plaintiff,**

**v.**                                      **Case No: 3:09cv87/WS/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
        **Defendant.**

_____

### REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Pugh's application for disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

Plaintiff, Charles Pugh, filed applications for benefits claiming an onset of disability as of March 1, 1992. The applications were denied initially and on reconsideration, and plaintiff requested a hearing before an administrative law judge (ALJ). A hearing was held on June 22, 2004 at which Mr. Pugh was represented by counsel and testified. A vocational expert also testified. The ALJ entered an unfavorable decision and the Appeals Council declined review. Mr. Pugh filed an appeal in this court, but the Commissioner asked that the matter be remanded for further review because the ALJ had not addressed Mr. Pugh's possible glaucoma as a severe or disabling condition. The request was granted and the Appeals Council remanded the claims to the ALJ who held a second hearing on October 22, 2007. Again, Mr. Pugh was represented by counsel and testified, and a vocational expert also testified. The ALJ rendered an unfavorable decision on January 18, 2008 (tr. 455-475). Mr. Pugh requested review by the Appeals Council without submitting additional evidence and the Appeals Council declined review (tr. 438-441). The Commissioner has therefore made a final decision, and the matter is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This timely appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that Mr. Pugh last met the disability insured status requirements of the Social Security Act on September 30, 1997; that he had not engaged in any substantial gainful activity since September 7, 2001; that he had severe impairments of degenerative disc disease of the cervical and lumbar spine; that his glaucoma, chest pain, arthritis in the left arm and right hand and leg pain were non-severe for any 12 full months during the relevant period of adjudication; that he did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20

C.F.R., Part 404, Subpart P, Appendix 1; that he had the residual functional capacity to perform at the light strength or exertional level; that he was unable to perform his past relevant work as a construction laborer; that he was 48 years old on the date of his application, with a high school education and ability to communicate in the English language; that there were jobs that existed in significant numbers in the national economy that he could perform; and that he was not under a disability as defined in the Act (tr. 455-475).

The ALJ also found that Mr. Pugh had filed an earlier application that was denied on December 29, 1997 by an ALJ's decision after an administrative hearing. Because that decision was not appealed, the ALJ in the instant case found that administrative *res judicata* applied to the instant applications. Therefore, Mr. Pugh was not disabled as of December 29, 1997 as a matter of law, *Cherry v. Heckler*, 760 F.2d 1186 (11th Cir. 1985). Mr. Pugh does not contest this holding. Therefore, the relevant period for consideration begins on December 30, 1997, and Mr. Pugh has the burden of showing that he became disabled on or after that date. Moreover, the ALJ also held that Mr. Pugh was insured for disability benefits through September 30, 1997, a date that came before the *res judicata* date. Therefore, the ALJ found that if Mr. Pugh were eligible for benefits, his benefits would be limited to SSI benefits because he was not insured for disability purposes during the relevant period (tr. 457).

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v.*

*Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence.  *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).   Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed.  *Ingram*, 496 F.3d at 1260;  *Miles*, 84 F.3d at 1400.  Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion.  *Moore*, 405 F.3d at 1211 (citation omitted).   In determining whether substantial evidence exists, the court  must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence.  *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  Findings of fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The social security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits. *See Moore,* 405 F.3d at 1211; 20 C.F.R. § 416.912 (2005) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2005) (five-step determination for DIB). A finding of disability or no disability at any step renders further evaluation unnecessary. The steps are:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore*, 405 F.3d at 1211 (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir.1985)). If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987). If the Commissioner carries this burden, claimant must prove that he cannot perform the work suggested by the Commissioner. *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

Mr. Pugh claims an onset date of March 1, 1992. It is unclear from the record why he chose that particular date. As explained above, the relevant period for consideration in this appeal begins on December 30, 1997. However, a brief review

of Mr. Pugh's medical condition prior to that date is useful for background.

A consultation note dated May 13, 1993 by orthopedic surgeon Steven A. Slobodian, M.D., indicates that Mr. Pugh gave him a history of a work-related injury in January 1993 while working at the Port of Pensacola. Again, by history, Mr. Pugh was treated at the Medical Center Clinic in Pensacola by Richard Hooper, M.D., an orthopedic surgeon, who diagnosed degenerative disc disease and recommended a lumbosacral MRI. According to Dr. Hooper's notes, the MRI revealed a desiccated disc with a large central bulge which abutted but did not press on the nerve root. No surgery was performed and Mr. Pugh was referred to rehabilitation for possible initiation into the work performance program. When examined by Dr. Slobodian Mr. Pugh made complaints of shoulder pain but nothing else specific. There was no lower back pain but intermittent back pain was reported with increase in activity. He denied, but subsequently remembered, a previous history of low back pain in the early 1980's when he was a pulpwood worker. Medical Center Clinic records from May 1980 indicated there was no evidence of orthopedic or neurologic abnormality. Those records further indicated that the then treating physician, Dr. Charles Smith, found that it was difficult to tell whether there was a true malingering type syndrome or whether Mr. Pugh actually had an early conversional type or hysterical type problem with respect to his back. Dr. Slobodian noted that Mr. Pugh's complaints were inconsistent and seemed to change as the examination progressed. Ultimately, Dr. Slobodian's impression was that Mr. Pugh had an exacerbation of a previous lumbosacral strain but that there was strong evidence for pain amplification with chart notation of possible malingering as far back as 1980 and that his pain symptomatology was felt to be non-anatomical and non-physiological. Specifically, Dr. Slobodian noted that "[t]he veracity of the patient is highly suspect as he is noted to significantly alter his story as additional details of his past were provided to him." (Tr. 301). Dr. Slobodian further felt that it would not be appropriate for Mr. Pugh to enter the work performance program, that no follow up was needed, and that he

would be able to return to work at the light work level although he should probably refrain from heavy manual labor. (*Id.*)

Approximately one and one-half years later Mr. Pugh was examined by a pain management specialist, Ruben Timmons, M.D. After an examination on November 1, 1994, Dr. Timmons noted that there was degenerative disc disease with desiccation at L5-S1 but that Mr. Pugh exhibited marked illness behavior with over somatization (tr. 305). Nevertheless, Dr. Timmons performed a lumbar epidural steroid injection on November 8 (tr. 227). On follow up dated December 7, 1994, he noted that he could identify no findings that would explain Mr. Pugh's symptoms, and felt that there was no need for further injections or surgery (tr. 218). Finally, on January 17, 1995, Dr. Timmons noted that Mr. Pugh complained of pain all over his body and displayed marked illness behavior with several non-organic indicators. He felt that Mr. Pugh could return to work full time with a two percent impairment. Dr. Timmons again noted that there were no organic findings that would explain Mr. Pugh's symptoms (tr. 212).

The next series of entries in the medical record is for several physical therapy sessions from April to June 1997, more than two years after Mr. Pugh last saw Dr. Timmons. In the last entry the physical therapist indicated that Mr. Pugh showed no improvement and did not appear appropriate for continued physical therapy (tr. 309).

On May 29, 1997, Mr. Pugh returned to Dr. Hooper complaining of neck pain after a motor vehicle accident (tr. 336). Mr. Pugh saw Dr. Hooper through the summer of 1998. On August 18 and August 27, 1998, his requests for refills of Darvocet were denied (tr. 330-331). On September 24, 1998, Dr. Hooper noted that Mr. Pugh walked slowly and carefully but was able to walk on heel and toe. There was normal range of motion in his neck and there was no spasm. There was no tenderness over his facets or discs and all motor, sensory and reflexes in the arms were intact. Flexion and extension in his low back were slightly decreased, there was possible spasm but no point tenderness, and motor, sensory and reflexes were

intact.  Dr. Hooper's assessment was chronic neck and back pain.  Mr. Pugh was restricted to lifting no more than five pounds, and to avoid repetitive lifting, bending and stooping.  Dr. Hooper prescribed Darvocet and told Mr. Pugh to return in one year (tr. 328).

From September 1998 until May 2002 there were no medical entries other than a 1999 visit to the emergency room for chest pain (tr. 243) and a February 2002 emergency room visit for a "bumped head."  (Tr. 253).  Then, on May 3, 2002, Mr. Pugh was examined by Richard Lucey, M.D., at the request of the State Agency.  The second page of Dr. Lucey's report is missing from the record and his only conclusion on the third page indicates an appraisal of degenerative arthritis neck, low back and knees.  A range of motion sheet attached showed slightly decreased range of motion in the neck and lumbar spine with all other tests being normal (tr. 263-266).  There is another gap in the medical record of approximately one year until April and May, 2003 when plaintiff was seen on several occasions by a chiropractor, Ted Rice, D.C.  During that period, an MRI was performed which disclosed degenerative disc disease at C5-6 and C6-7 with broad based, shallow annular bulges, mild foraminal narrowing on the left at C6-7 and minor foraminal narrowing at C5-6 but no clear cut significant foraminal narrowing and no disc herniation or fracture (tr. 339-340).

On March 13, 2003, Mr. Pugh returned to Dr. Hooper, who remarked he had not been seen in about five years.  Apparently Mr. Pugh had been doing well but described being hit in the rear while a passenger in a car.  He was mildly tender over the C5-C6 discs but had no specific tenderness in his low back.  His neurological examination was basically normal.  X-rays of the lumbar spine were normal but there was some osteophyte formation in the neck without stenosis or impingement.  Dr. Hooper's assessment was cervical and lumbar strain.  He further noted that Mr. Pugh was on a number of medications but did not bring them with him and could not remember what they were.  Dr. Hooper concluded by stating "I believe he is

disabled." (Tr. 320)

On April 24, 2003 Mr. Pugh was examined by David Fairleigh, M.D., a pain management specialist, for lower back and neck pain. He gave a history of a more recent automobile accident on March 8, 2003 in which he was a passenger in a car that was hit from the rear. Mr. Pugh gave a history of having recently seen Dr. Hooper who did not feel he was a surgical candidate. Dr. Hooper had prescribed medications but Mr. Pugh did not have them filled. Mr. Pugh presently complained of neck pain, back pain, arm pain, leg pain, all equal in intensity. His pain was constant, aching and with intermittent shooting pain in the hands. The pain was worse on sitting, better with changing positions and lying down. On physical examination Mr. Pugh walked with a mild limp but arose from a sitting position with minimal discomfort. He could heel and toe walk without difficulty. He had full range of motion in his back and there was no tenderness except for minimal tenderness of the paraspinus muscles. His extremities were normal and his neurological exam was normal. After a lengthy discussion, Dr. Fairleigh felt that Mr. Pugh was not a good surgical candidate. Mr. Pugh did not want to have any injections because he felt that his pain was not intense or limiting enough and Dr. Fairleigh felt that Ibuprofen, Motrin, ice and heat, home exercises and continued treatment by the chiropractor would be sufficient (tr. 376-378). A month later, Dr. Fairleigh filled out a physical capacities evaluation in which he opined that Mr. Pugh could sit for a maximum of two hours, stand and walk for four hours, would need to lie down several times each day and could lift 10 pounds occasionally and up to five pounds frequently (tr. 379-382). Dr. Fairleigh also filled out a Clinical Assessment of Pain form in which he opined that pain was present to such an extent as to be distracting from work, that pain would be greatly increased with physical activity (tr. 382-383).

On September 17, 2003, Mr. Pugh was examined by C.W. Koulosis, M.D., an orthopedic surgeon, at the request of the State Agency. His examination was entirely normal, including motor strength, reflexes and sensation. There was no

spasm noted and x-rays revealed only mild spondylosis at C5-6 and mild degenerative joint disease at L5-S1. Dr. Koulosis noted "Mr. Pugh complains of neck and low back pain but has absolutely no upper or lower extremity radicular component. At this juncture, no further diagnostic or treatment modalities are indicated other than a self directed exercise program." (Tr. 389) Dr. Koulosis also filled out a medical assessment form in which he indicated that lifting and carrying were not affected by Mr. Pugh's condition, and that there was no impairment in sitting, standing and walking or in the use of hands and feet. Dr. Koulosis noted no impairment of any kind anywhere on the form (tr. 391-394).

The last two medical entries from Dr. Fairleigh are dated nearly a year after he last saw Mr. Pugh. On a February 20, 2004 visit, Mr. Pugh described his pain level as 8 out of 10 but physical examination was normal. A month later, on March 19, 2004, Mr. Pugh described his pain level as 2 out of 10. Physical examination was again normal (tr. 411-413).

On June 15, 2007 (after more then three years without any treatment) Mr. Pugh was examined by Michael Kasabian, M.D., a family practitioner, at the request of the state agency. X-rays of the thoracic and lumbar spine taken that day were reported as normal (tr. 530). Mr. Pugh gave a history of neck and low back pain, sometimes going into his arms and legs. He had uncorrected visual acuity of 20/50 in both eyes. Deep tendon reflexes were underactive (+1/4) in the legs but normal in the arms. Muscle strength was normal except for the right hand where grip strength was slightly below normal, apparently secondary to pain due to reported arthritis. Mr. Pugh could heel and toe walk, straight leg raising was normal in both legs. There was some low back tenderness with some spasm at the L4-5 level. Mr. Pugh had a cane but could walk normally without it. Dr. Kasabian's impression was neck pain with possible subjective cervical radiculopathy, possible tendinitis versus arthritis in the right hand and low back pain with no objective radiculopathy (tr. 519-520). In a Medical Statement Dr. Kasabian opined that Mr. Pugh could lift and carry up to 20

pounds frequently, had no limits on sitting, standing and walking, did not require the use of a cane, had some restrictions on the use of his right hand but not his left and was otherwise unrestricted other than working around unprotected heights and operating machinery and motor vehicles (tr. 521-526).  Range of motion at all levels was normal except for some decrease on the left side of the neck and on left extension of the low back (tr. 527-529).

## DISCUSSION

Mr. Pugh argues that the ALJ erred in failing to assign appropriate weight to the opinions of his treating physicians, in giving determinative weight to the opinion of an examining physician, Dr. Kasabian, and in failing to show that the opinions of Dr. Lucey and Dr. Koulisis should be given any weight at all, and that he was disabled from his onset date as a matter of law.  The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained.  The issue thus presented is whether the ALJ's decision that Mr. Pugh was not disabled, in light of his physical condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

1. Treating physicians.

Mr. Pugh first contends that the ALJ erred in not giving appropriate weight to the opinions of his treating physicians, Dr. Hooper, Dr. Fairleigh and Dr. Rice. Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  "Good cause" exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips,* 357 F.3d at 1241; see

also *Lewis*, 125 F.3d at 1440 (citing cases).

     If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. 404.1527(d).

     The opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician, whose opinion generally carries greater weight. *See* 20 C. F. R. § 404.1527(d)(1); *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1255 (M.D.Fla. 2005). However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability. *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

     "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 352 F.3d at 1241. Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050,

1053 (11th Cir. 1986));[1] *see also Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 591 (11th Cir. 2006) (Table, text in WESTLAW)(also citing *MacGregor*). However, because the ALJ considers all the evidence, he is informed concerning a claimant's entire medical record. In this record, there is abundant evidence that Mr. Pugh's earliest treating physicians placed little weight on his credibility. Dr. Slobodian and Dr. Timmons clearly felt that Mr. Pugh was exaggerating his symptoms (tr. 212, 298, 305).

"[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[2] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand, supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief,

---

[1] *MacGregor* further held that "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." 786 F.2d at 1053.

[2] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

is the basis for the ALJ's credibility determination.

Here Mr. Pugh argues that Dr. Hooper, an orthopedic surgeon, Dr. Fairleigh, a pain management specialist, and Dr. Rice, a chiropractor, are more qualified than the examining physicians because of their respective specialties and because of their length of treatment. The ALJ did not agree. In his 2004 decision he discounted the treating physicians' opinions because they were not supported by their own records, because there were lengthy gaps in the treatment record, and because Mr. Pugh's pain allegations were thought by Dr. Timmons and Dr. Slobodian to be inconsistent with the objective evidence. The ALJ therefore gave substantial weight to the opinion of Dr. Koulisis (tr. 21-23). Mr. Pugh says this was incorrect and was "correctly reversed." (Doc. 9, p. 12). This is factually incorrect. Mr. Pugh appealed the 2004 decision to the Appeals Council without success (tr. 6-8). Mr. Pugh then filed suit in this court in Case No. 3:06cv59/RV/EMT. Rather than file an answer, the Commissioner moved for remand, contending that the ALJ had failed to consider Mr. Pugh's glaucoma, and that the court should sent the case back to the Commissioner for further consideration, which the court did. *Pugh v. Barnhart*, 3:06cv59 (N.D. Fla. 2006). The ALJ's reliance on Dr. Koulisis' opinion was not even mentioned in the Commissioner's motion for remand, or in the court's order, or in the Appeals Council's order remanding the case.

It is true that a specialist's opinion is entitled to greater weight then that of a non-specialist, all other things being equal, 20 C. F. R. § 416.927(d)5, but here all other things were not equal. There were lengthy gaps in treatment, and two of Mr. Pugh's physicians did not find him to be credible. Furthermore, as discussed in the next section, Dr. Fairleigh's classification as a "treating physician" is questionable. It was within the ALJ's realm of judging to choose which physician's opinion more closely fit the overall record. There was substantial record evidence to support the ALJ's discounting of the opinions of Dr. Hooper, Dr. Fairleigh, and Dr. Rice, and Mr. Pugh is not entitled to reversal on this ground.

2.    <u>Examining physicians</u>

Mr. Pugh next contends that the ALJ erred in giving determinative weight to the opinion of examining physician Dr. Kasabian over the opinion of Dr. Fairleigh. In his 2008 decision, now under review, the ALJ placed emphasis on a more recent medical examination by Dr. Kasabian, rather than on the opinion of Dr. Koulisis, upon which he had relied in his 2004 decision.  Mr. Pugh says this was unsupported, because the opinions of the treating physicians should have been given controlling weight, and further that the ALJ mentioned the opinions of Dr. Lucey and Dr. Koulisis without explaining what, if any, weight their opinions were given.

Mr. Pugh states that the ALJ's apparent discounting of Dr. Fairleigh's opinion was totally unjustified because Dr. Fairleigh's opinion was in fact consistent with his own notes.  He points to Dr. Fairleigh's statement that Mr. Pugh was "in obvious pain," which is totally consistent with a finding of physical limitations.  While Dr. Fairleigh did so state, Mr. Pugh's argument is undercut by other parts of Dr. Fairleigh's record.  First, Dr. Fairleigh cannot fairly be considered a treating physician because he saw Mr. Pugh only once before he filled out the physical capacities evaluation form.  "Generally, we give more weight to opinions of treating sources, since these sources are more likely to be the medical professionals most able to provide a detailed longitudinal picture of your medical impairment(s) . . . ." 20 C. F. R. § 416.927(d)(2).  Dr. Fairleigh first saw Mr. Pugh on April 23, 2004 (tr. 376-78).  A month later, without an intervening visit, Dr. Fairleigh filled out the forms in which he opined that Mr. Pugh's condition was effectively disabling (tr. 379-83).  Dr. Fairleigh saw Mr. Pugh only twice thereafter, in February and March, 2004, and Mr. Pugh reported that his pain was eight out of ten at the first visit but only two out of ten on the second. In light of all the other inconsistencies in the record, and the serious questions about Mr. Pugh's veracity, the ALJ did not err in discounting Dr. Fairleigh's opinion.  There was substantial record evidence to support his finding that Dr. Kasabian's opinion was entitled to determinative weight, and Mr. Pugh is not

entitled to reversal on this ground.

Finally, Mr. Pugh argues that this court should affirm only if it finds that it is reasonable for someone to be able to lift and carry up to 20 pounds when that person is in obvious pain while picking up a small card from a table. Were that the only evidence, and if that evidence were found to be fully credible by the finder of fact, the court might agree. The entirety of the medical record here paints a much more complete, and much less limiting, picture of Mr. Pugh's condition. The ALJ did not err.

Accordingly, it is respectfully RECOMMENDED that the Commissioner's decision be AFFIRMED, that judgment be entered in favor of the defendant, and that the clerk be directed to close the file.

At Pensacola, Florida this 19th day of February, 2010.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO PARTIES**

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).